Con-Strux Inc. Mr. Grau was convicted of unlawful possession of ammunition, one bullet that was found in an orange plastic toy gun that was incapable of firing any bullet. His defense at trial was that the government failed to prove that he knew this was a real bullet. The evidence supporting this theory included, one, the fact that the bullet was in an obviously fake orange plastic toy gun.  And the fact that the police, at first, until they examined it, didn't think any of this was real. The store detective thought it was a water gun, and one of the arresting officers told Mr. Grau that he would probably be released with a DAT. But the district court... Which Mr. Grau responded, not likely, or something along those lines. Right, but we have no idea what that meant. Mr. Grau, he was a convicted felon. He had a prior record. It may have not been within his experience that he had ever been released with a DAT and didn't think that would happen. But the court excluded defense evidence that directly supported this defense and refused to... That answers really the question I have. The defense is about his mental state. Right. And, of course, there's no actual direct evidence of his mental state because what he told the police about this is hearsay. He didn't testify. So we're trying to draw inferences about what was in his mind. How does the fact that such things as fake bullets exist and are in the marketplace tell us anything about what he thought? There's no evidence as to whether he had ever gone on the Internet, whether he had ever purchased fake bullets, whether he'd ever seen fake bullets. So why does the mere existence of this material tell us something about what's in his head? Why is it relevant? Because the government also had no direct evidence, and they were also relying on an assumption that because it looks real, of course he knew it was real. And so this evidence would have rebutted the assumption to some extent. And we have to remember that the relevant standard only requires that the evidence have some tendency to make a fact of consequence more or less probable than it would be without the evidence. Except what he had in his pocket was a baggie containing what on chemical analysis turns out to be marijuana, which he says he found in the park. You could put on your paralegal to testify, here is a baggie of oregano that I bought in Fairway, because that would show that there are things that look like marijuana and that people have sometimes sold to cheap customers pretending it's marijuana. That would be relevant? The existence of oregano is relevant to the mental state of the person? That's a different question, because everybody knows that there are other things that could look like marijuana, oregano, or tea, and that could be argued. That could certainly be argued. Whether or not that would be admissible as evidence would be necessary, maybe it would be admissible. I don't know. That's a different question. What we have here is a situation where the jury, without this evidence, has no reason to know. Some jurors might know, some might not, but that's not in the evidence that the existence of fake but real-looking bullets, that this is a thing, that this exists out there and that it's widely available. What is the evidence that it actually does exist out there or that these particular items that are in question are in fact fake? Because your predecessor counsel studiously avoided asking the expert, the ATF agent who was on the stand as an expert, to assess these bullets and tell us are these fake or real. And as Judge Hosting pointed out, the paralegal is not an expert and can't say whether they're real or not. And as he put it, somewhat cryptically, but I think his point is, there's no authenticity on the Internet. What the evidence is is that the paralegal bought something that some anonymous website represented was a fake bullet, and that representation is hearsay. Your Honor, the defense counsel did show these bullets to the agent and asked him how he could tell that this wasn't real. He said they were judged by the weight. I can't say for sure they're real because of the weight, but there was no actual testimony where he was asked, do what you've got to do, make your assessment, and tell me is this real, which might have been useful even as a questioning of the expert's credentials, but either defense counsel didn't think of it or was afraid to do it. Well, I don't think there was any question that there was any fear. I think the defense counsel believed that that's what she was doing. She showed the agent these fake bullets, which were fake. They didn't have the primer stamp and things like that. So she showed him these and she asked him, how could you tell that this is not a real bullet? And he said, well, this one feels light. It looks a little different. It also feels light. So it was just understood that these were fake. That was an oversight, if anything. But the paralegal was going to testify to the fact that she went on Amazon, and the Amazon ads are in the appendix, and ordered, and there are multiple ads, ordered for $15 or $18 for six replica bullets. They're sold as replica bullets. They're not real bullets. And that is as much authenticity as required. It's just to show that these are a thing that people can buy. There's a marketplace for these things. And this would have rebutted the evidence that was in the case, which was the government's evidence that came in on the government's case, which was that, according to Agent Stern, the only fake bullets he had ever seen were fake bullets of the type that law enforcement had, simulation used in police training, or formerly live rounds that had been converted into souvenirs that some officers wore around their necks on necklaces. And he said he'd never even seen these. He'd never even seen the keychain. He's never even seen it, and he is an expert in this, and it's his job to know about bullets and testify in court. Why on earth would we think that Mr. Grau has seen that and has some knowledge that there are marketplaces of fake bullets? Well, because the defense is not just stuck with whatever the government witnesses say. The defense has a right to put on trial witnesses. No, you're not stuck with it, but you just represented that as part of how we're going to assess this. And I'm just asking, why would we think, what other than speculation links what the paralegal bought on Amazon to what Mr. Grau thought he had in his pocket? Well, Your Honor, it wasn't, we didn't have, we argue that we didn't have to show that Mr. Grau knew what the paralegal found or specifically had ordered things or knew. It's just, as in Omanumu, that this defense that he didn't necessarily, he wouldn't have necessarily assumed, finding a bullet that looks real in an obviously fake toy plastic gun, he wouldn't have necessarily assumed that this was a real bullet. The evidence that this kind of replica bullet is out there, that it's widely available, that it's cheap, and that it's available to the public, not just to police officers, would have furthered the ball to some extent on that defense that you can't just assume that he knew the bullet was real. No. He didn't take the stand, right? He did not. So he didn't put his state of mind in issue. He did not, and there was no direct evidence on either side. But what the government had going for it on its side was that, oh, come on, look at this, look at the pictures, this is a real bullet, it must be real. In fact, that was its sole argument on the Rule 29 motion. Now, by the time it came along to summation, it added, well, it was modified, he must have known, but there was no evidence that he knew. There was no evidence from the outside. In fact, the government conceded that, you know, you'd have to examine this a bit, but asked the jury to assume that he must have examined it, and there was no evidence for that. From the outside, it just looked like an orange plastic water gun that had some tape around one or two parts. Thank you, Ms. Cassidy. You've reserved two minutes for rebuttal. Thank you. Pellegrino. Please. May it please the Court, good morning. My name is Louis Pellegrino. I represent the United States, and I represented the United States in the proceedings below. In the trial court below, there was only one question in dispute, and that is whether the defendant knew that the ammunition he possessed was ammunition within the meaning of the statute. The government's evidence at trial overwhelmingly proved that he did know. Now, the defense suggests that the only argument that the government made in this regard is that the bullet looked real, therefore it must have been real, but the government presented more evidence than that. First, the defendant was arrested at Macy's while carrying a plastic gun modified to be a potentially dangerous weapon. It was not a movie prop. It was not a Halloween costume weapon. It was a plastic gun modified to be something more dangerous. That was evident from the testimony. Someone had tried to modify it to make it more dangerous. I take it nothing in the government's brief relies on the testimony of Officer Boyd. Is that right? It does not, Your Honor. However, there's been some discussion. Both your experts said that this was not, in fact, dangerous, that this was a failed attempt to make the gun operate. And the other officer gave a very different account of what happened to the bullet during the packaging of the evidence. Yes, Your Honor. Let me take a couple of those points. One is that it's not correct to say that the officers were not concerned about the dangerousness of the weapon. At A85 in the appellate record, there's a discussion with Officer Caraballo immediately after. Once again, there's something of a distinction. One officer is pointing it at the other one, which I hope suggests that he did not think this was a very fearsome item. And the other fellow said, don't point this at me, which, as you fairly argue, suggests that he had a more prudent approach to this item. Right, and we asked him why, and he said it could potentially go off. And I think all of the officers— But that's before they examined it. By the time they're done examining it, you'll probably get a DAT and be out of here this afternoon. They're kind of laughing and scratching at what is a pretty ridiculous piece of equipment that this fellow had. I think that's right. However, Special Agent Stern, who was the expert here and testified about the firearm, testified that he was not able to determine whether it was, in fact, a firearm or not. I think he could look at it and see that it was a plastic gun and that it had been modified. But he had to send it to the firearms technology branch in West Virginia to make that definitive assessment. And when ATF did that assessment, Special Agent Stern testified that the assessment was, it was, in fact, potentially capable of being a real weapon, insofar as it had all the necessary parts or mechanisms to make it a real weapon. And the only reason that it was not was because the firing pin did not strike the bullet with enough force to actually discharge the propellant and shoot the bullet out of the gun, as opposed to just ejecting the entire cartridge out of the gun, which is what happened. So in that regard, it was a sinister device. And if you look at the depiction of the weapon in the record at A347, it's immediately apparent upon looking at the weapon, just upon visual inspection, that it was a device that had been modified for a more sinister purpose. There's black electrical tape wrapped around the outside of the toy gun. Special Agent Stern testified that the gun also had a longer barrel that had been broken off. I don't know whether Mr. Grau would have noticed that or not, but he certainly would have noticed the .38 special bullet sticking out of the front of the gun rather precariously. And Mr. Grau's defense team adopted the position that at the time he came upon the gun in the park, it was in the condition in which he found it. Which means he would have just picked it up with that ammunition sticking out of the front of it and jammed it in his pocket, despite it being wrapped in tape, despite the bullet sticking out of the front like that. And then his defense was, well, I thought it was a movie prop, but that looks nothing like a movie prop, which would have been created to resemble a real firearm. Furthermore, it's important to note the additional evidence that the government provided regarding Mr. Grau's state of mind. And those are Mr. Grau's statements. Mr. Grau made no less than six key post-arrest statements, none of which, by the way, support his contention that he thought it was a toy. Mr. Grau never said, I thought this was fake, why are you arresting me for a fake gun and a fake bullet? In fact, he said the opposite. He said, it's not mine. He said, I found it in the park. Now, why would he say that? Because he's disclaiming ownership of it. He knows, as a prior convicted felon, and no doubt he was instructed at some point when he was convicted of that prior felony that he, in federal court you're instructed you can't possess a firearm, destructive device, or ammunition. He received a similar instruction. He knew that possessing this thing, he was going to get in trouble. That's why he said, it's not mine. He told not one but two officers that he found it in the park. And then he said, I was going to turn it in. And the defense says, well, that was just joking. But his next statement about, as Judge Lynch referred to, Officer Caraballo saying, you're going to be out of here in a few minutes. We'll get you processed. You're going to get a DAT or a desk appearance ticket. He said, I just know I'm not going to get a DAT. Officer Caraballo said, why is that? Do you have warrants? He said, I just know I'm not going to get a DAT. That's all powerful evidence of his guilty state of mind because he knew that he was not. Well, maybe relevant evidence of his guilty state of mind. That powerful is pushing it. I assume from the fact that you're going to all this trouble with this guy that he must have some kind of substantial criminal history. And might not that be a reason why he thought he wasn't going to get a desk appearance ticket? Is that even for a trivial crime, such a crime by him might be taken more seriously? These are inferences that people can draw, but let's not get carried away with how overwhelming they are. Fair enough, Your Honor. Still, the jury was presented with circumstantial evidence that they considered. That evidence was presented to them throughout the trial and then discussed at closing. And why is it such a big problem to let the defense put on their circumstantial evidence such as it is? Well, the government, if you look throughout the record, did not object to the defense raising this entire argument. Their theory of the case is that the ammunition was not real. That's not actually a defense. I thought the defense was not that the ammunition was not real. The defense was that you have not proven beyond a reasonable doubt that he knew it was real. Correct, Your Honor. That's right. But that's not actually a defense under 921 under the statute.  The statute refers to ammunition, cartridge cases, primers, bullets, or propellant powder designed for use in any firearm. All of those things, with the exception of the first, the ammunition is the entire package, are components of ammunition. And, therefore, under the statute, Mr. Grau, if you change the facts just a little bit, if he was in possession of just cartridge cases designed for use in any firearm, if he knowingly possessed those, he could potentially be charged under the statute. Right. But if he possessed something that he knew to be or that he believed to be a replica bullet, that's not covered by the statute. How do you say it is? Because I don't remember, I don't think I looked at what the government's requests to charge were, but the actual charge that was given certainly told the jury that this was a defense. It did tell them that, yes. So back to my original point, which was we did not seek to prevent the defense from providing any information about their defense that it was, that he believed it was a fake bullet. But we did draw lines around the point where they wanted to admit the paralegal because that was simply too far. And we talked about, Judge Lynch, you talked about that before with the appellant. Introducing that evidence would have been sort of a rabbit hole. You're talking about an entirely different analysis from a witness who never had spoken to Mr. Grau, was not going to relay statements by Mr. Grau, as in the Scully case, or, for example, the Onanuma case, which was cited by the appellant. In that case, Onanuma wanted, there were two differences. One was Onanuma had made a statement at the time of the arrest about the diamonds. It's about four days into his custody, I think, but he said to law enforcement, oh, that's heroin? They told me that I would get $5,000 if I smuggled these diamonds. So he had made that statement. There was some evidence in the record, at least, to support that theory. Secondly, Onanuma wanted to introduce an expert on diamonds. And, of course, an expert can rely on opinion, hearsay, information provided to them by lawyers. It's a much broader scope in terms of what they're allowed to testify about. Here, the defense wanted to introduce the paralegal testimony, which was limited only to what she had seen, heard, and did on Amazon. So, for those reasons, unless the Court has any further questions, we ask that the verdict of the trial court be affirmed. Thank you, Mr. Pellegrino. Ms. Cassidy? I just have a few points. First, the government did not even object to the calling of the paralegal. The defense was just discussing scheduling with the judge, and the judge sua sponte rejected that testimony. The judge sua sponte ruled that that was irrelevant. Later, when defense counsel still argued that the bullets should nonetheless, the four bullets, Exhibit L, that had been shown to Agent Stern, the fake replica bullets ordered online, should be introduced, and the keychain, the Court allowed the keychain, which was also bought by the paralegal online, but didn't allow the four replica bullets. Why? The only reason is that the government did not object to the keychain, and it objected to the four bullets. There was no reason given, but the four bullets were much, much more helpful to the defense. That seems to be the only discrimination between the keychain, which was a fob on a keychain that looked obviously fake, between that and the four replica bullets, which looked much more real. Well, I'm looking at it right now. I'm not so sure. To me, it seems it is debatable whether it's fake or not. It may well have started out as something real, and then somebody inserted the hook that then holds it onto the keychain. Also, the jury had no idea where this came from, because the paralegal wasn't allowed to testify. What the jury did not have before it was the simple fact that this is a thing out there, that there are replica bullets, that they're on sale for very little money on Amazon, that they're available to anybody who wants them. So the fob and the bullet was out there, was in evidence. Well, that was in evidence, but the jury had no idea where it came from, because the paralegal bought that also. The standard is fake. It was shown to the store detective, Ciaradongo. But because it was going to be authenticated later through the paralegal, and that was not allowed, the jury still didn't even have any idea where that came from. And that was also much, much less supportive of the defense because of the way it looked. Agent Stern testified that he didn't think this gun could fire anything. He didn't think it was real. And I think he even tried to fire it, tried to test it himself, sent it to the lab just to make sure. He testified that if you pulled the trigger, the bullet would just fall out, that there was nothing even close to being operable here. And finally, on the Omanumu decision, there were two issues. One was the relevance, and one was whether the expert testimony was admissible under 702. On the relevance decision, the court's decision was based on the tendency of this evidence to show that basically this kind of diamond smuggling did exist. It was a thing. Just like here, we wanted to show that this kind of replica did exist, that it was out there, and that would have supported the defense. Thank you, Ms. Kessler. Thank you. Thank you both. We'll reserve decision.  Johnson versus superintendent, or Johnson versus Artoos. Good morning. Good morning. May it please the Court, my name is Alice Wiseman from the Manhattan District Attorney's Office. I'm appearing on behalf of the respondent appellant in this matter. Your Honors, the district court here granted the habeas petition based on its conclusion that the Batson Stage 3 factual findings of the state courts were clearly erroneous. That was the incorrect standard to use in this habeas proceeding. Moreover, even by that standard, which is much less deferential than the actual standard that should have been applied, that ruling was an error. In this case, I think there's no dispute that the state courts, both the trial court and the appellate court, recognized and applied the correct controlling law here, which is the Batson procedure for determining a Batson challenge. The trial court found a prima facie case, asked for race-neutral reasons. The prosecutor gave what I think everyone concedes were race-neutral reasons. The trial court then invited the defense to explain why, in its view, these reasons were pretextual. It then listened to the defense's arguments, it listened to the prosecutor's arguments, and in each instance decided to allow the prosecutor's challenge. So what we're left with here, then, is the only way that a habeas corpus petition could be granted here is if those Stage 3 findings of the court, which are pretext findings, were unreasonable. I'm not trying to put words in your mouth, but that's my answer. That is the word that was about to come from my mouth. Yes, Your Honor. And in making that determination, essentially what the district court did was to look at the cold record, which obviously is all that this court or the district court can have in front of it, and substitute its own opinion or judgment of the prosecutor's reasons for what the trial court found. That is very clearly not sufficient to grant a habeas corpus petition. The Supreme Court and this court have held repeatedly that it's not enough that reasonable minds might differ. It's not enough that even a contrary decision might be supported by the record. It's certainly not enough that the reviewing court, the habeas court, might have reached a different opinion in the first instance itself. Ms. Wiseman, let me focus you on, and I think I've got the names of these prospective jurors correct, but Ms. Williams compared to Mr. Wong. Ms. Williams, as I think the record shows, she was rejected by the reason given for her rejection was that she was young, a college student, and did not have much life experience. Correct, Your Honor. And I don't see a real distinction with any difference between those factors as they bear on her and as they bear on Mr. Wong. Well, I think, Your Honor, you have to look at the whole course of jury selection here. Ms. Williams was a juror who has been considered on the first day of jury selection. At the time that the prosecutor challenged her, in state court there are 20 peremptory challenges for cases of this nature. At the time the prosecutor challenged her, he used three of those challenges. And he explained, as you said, that he believes simply by virtue of her youth and the fact that she appeared to be a college student without any other life experience that was before the court, that he thought that in a case of this nature, you know, she was not a juror that he would want to sit. And I think that's certainly a valid, you know, there's nothing suspicious about that reasoning. I think he said she was a student, she was single, she was unmarried, and she was simply too young. I'm not sure that being a student, single, unmarried, and I don't know what simply too young means if the person was of the statutory age to serve. So that kind of looks to me a little odd. Well, Judge, the prosecutor amplified later that his view, I think he explained, this is a case, and it indeed is a case, and I know the facts and the details of this case haven't been threshed out in the briefing before you, but this is not only a very serious case, but a case of kidnapping and murder that involves cooperating witnesses, the people had testifying who were themselves very bad people, that involves a group out of a drug dealing milieu, it involved evaluating statements made to a detective that was not recorded, so it's not a simple case. It's a case that requires, I think, a lot of common sense and mature experience, and I think it's certainly valid for any prosecutor to consider that. And he, as I say, he does amplify later that this is his concern about the case and that he doesn't think that she has enough real-world experience. And I think that is valid. I mean, the fact is, you know— I worked as a security person in a rehab center who had experience with people who, when they get out of jail, have mental problems. The prosecution said that they were concerned that that person might be in contact with people who had degrees of substance abuse problems, who sort of knew too much about the prosecution's principal witness, who was a drug dealer. I mean, obviously you're dealing in a situation where you've got drug couriers and drug dealers fighting it out, killing each other. It seems to me that on the one hand you've got the student who's too young and doesn't know enough, and on the other hand you've got someone who's familiar with the world and who knows too much, and they just both happen to be African American. Judge, I don't think there's any inconsistency there. I mean, one may very well find that a person who doesn't have enough general experience to evaluate any serious case that involves serious issues—and again, he's not making— and for both of these things we have to realize that in the jury selection context you don't have unlimited time or ability to question people. So you're going to have to use—you're going to have to look at things and make determinations in categories or using proxies, and that's fine as long as those proxies are not race. So to say, hey, if you're just a college student and you don't, you know, have any other countervailing life experience that I'm aware of, then I will not—do not want you on a jury like this, versus looking at somebody who is a security guard and who— although the district court found that, oh, there was no evidence that this person dealt with possible drug-addicted people, everybody below seems to have believed and assumed it was true. The court did. The prosecutor did. The defense never challenged that. I think the district court judge is in the business, I can speak with a little knowledge, of picking juries. So I think you have a fairly sophisticated evaluator of how this was done here. I'm not—we can get into the question of the legal standard, which I think I'll defer to my colleagues on as to whether or not the legal standard was met here, but it is a little bit— Well, Your Honor, I'm sorry, I see my time is up, but if I could just— Please, please do. So with respect to Ms. Ritty, who is the security guard, I do want to point out that it's not just the prosecutor and the judge below who understood her references to working at a rehabilitation facility as involving drugs. It's also the defense never challenged that, and in fact never even challenged as pretextual this particular basis given for challenging this juror. And again, I think the prosecutor, as he specifically said, I don't know how her experience with people who might be drug addicts would affect her evaluation of the case, but that kind of experience, and it might also arise in a case where a person had family members who are addicts. For example, it could lead you in a lot of directions. It might make you say, well, I don't believe, I believe that drug addicts will say anything, or I hate drug dealers for doing this. So it's just too much of an uncertainty. That's what the prosecutor was saying in this case to put this person on. And I'm sorry, Your Honor, I didn't— Can I go back to Ms. Williams? I remember being trained as a prosecutor that, generally speaking, you didn't want young people on the jury because they're too idealistic and liberal, other things being equal, than older people with more experience. But I think the original question you were asking, and I don't know that you got all the way through your answer, was that there were other comparably young people with similar life experiences or lack of life experiences who were not black that the prosecutor didn't challenge. Yes, Your Honor, thank you. I did not finish my answer. So Williams's challenge was one of the first challenges that's used. At a time when the prosecutor, you know, is looking at the jurors in front of him and is saying, you know, this is a person who I don't necessarily know anything to her particular disfavor, but she falls into a category that I don't want on this jury. The next day, at the very end of the next day, when they've had a lot of trouble getting a jury in this case, when they still have to select four jurors and three alternates, and where they have come to the end of this jury veneer entirely. So if they don't have a jury here, they're going to have to come in the next morning with a whole new panel of people. Those people could be, I mean, we've all seen, I mean, we've all either tried cases or conducted trials, I'm sure, and we've seen that, you know, some veneers are good for the prosecution, some veneers are not. Some, you know, it's just the way, the luck of the draw. So at that point, when the prosecutor has five challenges remaining, if he uses two of them to strike these jurors, who, again, there's nothing specific about them personally that he says is bad, but they do fall into a category he doesn't want. And this is essentially what he says when asked that. His strategy is different at that point because he doesn't want to go into the next day with still potentially four jurors and three alternates to pick from a veneer that might be full of very bad jurors for the people. So he's going to make a different determination. He's going to be more careful about using the challenges. And that is reasonable strategy. Again, the heavy burden that has to be met to overcome the trial court's finding here, I don't think that... The trial judge in the state court who also has a lot of experience with jury selection and who is watching this proceeding transpire in front of him. Exactly, Your Honor. And not only watching the jurors, but watching and listening to the prosecutor and his ability, even on direct review, the ability of the trial judge there to assess the demeanour of the person who is explaining his challenge on that fundamental credibility issue does deserve enormous deference. You've reserved time for three minutes for rebuttal, Ms. Wiseman. Ms. Wiseman, excuse me. Mr. Holland. If it pleases the court, I think that the interesting thing is that Ms. Wiseman makes clear that there are categories of people that were not wanted on this jury, and it's pretty clear from the way that these challenges were exercised that the only category of people he did not want were African-Americans, and the prosecutor would go to any level to try to justify why he did that. Were there African-Americans who wound up on the jury? My understanding, there were two ultimately that did, but the basis for their criteria of admission obviously wasn't the subject of discussion, but I think we can find it in the course of this, which is that under Jordan v. Lefebvre, there's four different criteria that are race-neutral bases to strike a juror, being age, negative experience with law enforcement, demeanour, or type of employment. Going through all these, Judge Hellerstein clearly gave close attention, and he is a very skilled jurist who found that ultimately the trial judge not only abdicated in certain places his responsibility that's imposed on him in Batson and Perkett v. Elm to go into and really explore the explanations given to see if there is sort of fictitious or pretextual reasons given for discrimination, but he found that it was patently false, some of the explanations given that is far beyond the unreasonable threshold that he might have had to have found in order to be able to overturn the convictions. You see that particularly with the case of Ms. Caliste, who's the one who makes the hissing sound. At one point, this is a woman who the prosecutor says that his challenge is justified on the basis that he heard a hissing sound. He thought that she was having either an internal conversation and she was suffering some sort of mental illness is what is the... Did the trial judge credit that explanation? Absolutely not. I thought he said, if you understood it to be that, that's an okay reason. In that sense, yes, Judge, but before they said no, she was trying to hand the microphone to another juror. I understand that there was a back and forth, but then wasn't the default position ultimately. I just want to make sure I understand. No, no, that's absolutely correct, Judge, that he did find that it was true, that's what the prosecutor heard, but that's not one of the four race-neutral explanations. Wait, wait, wait, wait, wait, wait. When has the Supreme Court or this court ever said that there are only four possible reasons to challenge a juror that are race-neutral? I thought the law was any reason that is not race is a valid reason. It doesn't have to make sense. It has to be a good-faith belief by the prosecutor. And you're correct, Judge, you're not limited to that. Those are the four general categories of race-neutral. What if you challenged a juror because he or she was wearing sunglasses indoors and you thought that showed a sort of anti-establishment belief? That doesn't make a lot of sense to me, but I was told actually as a young prosecutor that that's something you should look for. Is that not proper? But that's not an immutable characteristic, like the issue of race that these jurors all experienced together, which they had in commonality with the defendant. How about this category, Frieda Bell, who's challenged because she struck the prosecutor as being perhaps mildly retarded, not able to follow a complicated case, and because her domestic partner was a convicted murderer. This is a murder case. I mean, do you think that that's not possibly race-neutral? No. And, Judge, let me explain why. Because particularly, I'm glad you brought up Ms. Bell, this is very close to what would be an excited utterance in a hearsay situation. The guy gives right off the bat what is his gut reaction when asked to justify it. When Ms. Bell said, I thought she was mildly retarded, inarticulate, wouldn't be able to express her views well, it's when he's discussing the fourth challenge. Ms. Ritty says, oh, yeah. By the way, it was because she's married to a convicted felon, and that factored into the people. Murderer. I'm sorry, convicted murderer. I'm sorry, Judge. That's a valid reason. Had that reason been given, we wouldn't be here today. With the secondary back-filling explanations that the prosecutor reached for, realizing he's got to bring these back to race-neutral explanations, had he given those up front, we never would have been here today. What would we say to a United States district court judge who's assessing a finding or a determination made in the New York State Supreme Court about these factors? I'm sorry, what would this court say to the district judge? What do we say? How do you discern? Essentially, it seems to me you're asking us to discern the credibility of the reasons given. Judge, I don't think that that's the sole thing that I'm citing to. And if I could, this court sits in de novo review. So even if Judge Hellerstein had it wrong and he ended up using the clearly erroneous standard, which I think he was saying not as a legal concept because he had spotted or he had identified that unreasonableness was the standard that he had to meet, he was saying that ultimately the judge, particularly Ms. Calise, never went beyond the hissing sound to go past the credibility of the prosecutor to determine whether indeed there was discrimination afoot, particularly when he heard three of four explanations started out with, I think these people somehow are inferior in their intellectual capability to serve on my jury. Your appellate division unanimously rejected that position. So it's not just the trial judge in the state system. You had a unanimous rejection by the appellate division as well, correct? That's correct, Judge Kuntz. And the court of appeals declined to grant permission to appeal. And that's also correct. I can't speak to the procedural aspect except to say, going back to the question I was asked earlier, if one of many explanations meets the race neutral criteria, then we can disregard the others and go ahead and accept that. That's really what had happened here, I think, both with particularly Ms. Calise, he heard the hissing. That's good enough, even though there is no other race neutral. The judge at trial did not apparently hear any hissing and was concerned about that because if that did not happen, then that would bear very strongly against the credibility of what the prosecutor was saying. Then the judge made an inquiry to find out, and apparently, at least the way the judge saw it, the witness indicated that she may have been wheezing because she had a cold. So the judge then determined, apparently, that the prosecutor had heard something. And the judge, at least, who was there and watching what went on, was apparently not that concerned about how the prosecutor interpreted it, maybe because the judge thought the prosecutor was, by and large, telling the truth. But if the thing hadn't happened, that would have changed the judge's evaluation. Now, this is all kind of speculation about what the judge is doing, but I'm having a little trouble with the premise that what a federal judge is supposed to do is to put himself into the place of the state trial judge without having seen any of this and say, well, I think this other question should have been asked. But, Your Honor, with that, I think you can't isolate the hissing sound from the explanation given of what the hissing sound meant to the prosecutor. Yeah, but the judge thought that that was good faith. Whether it was what the judge thought it was or whether that was what it actually was or what the witness said or the juror said it was, the judge believed that that's what the prosecutor thought. And the one thing the judge was concerned about was, was the whole thing made up. And it turned out that on inquiry, it wasn't. But respectfully, Judge, the issue was the hissing led him, the prosecutor, to believe that there was an internal monologue like there's mental illness, which the trial judge said absolutely not. She was handing the microphone. So immediately the concern is minimized, if not eliminated, that there should be some other explanation given for why this particular jury was stricken. So what you're saying is that the role of the federal judge is actually to fly spec, not the judge's degree of inquiry into each of these various objections. I don't know that that's the judge. I'm sorry, Your Honor. I don't think that's the sole role of the district judge. The role of the district judge in this court sitting de novo is to overcome an extreme malfunction of the criminal justice system, which I think we had happen here today, that we're discussing here. Can I ask one simple question? You only have to win on one of these people, right? That's correct. In other words, we've got four different examples, each of which have different facts. They may bear on each other to the extent they may create a collective impression, but at the end of the day, if in three of these cases we're satisfied that the trial judge's decision was at least reasonable, but one of them not, you still win. That's correct, Judge. I think going back to what Judge Kunst had asked, ultimately I think Williams is a very strong comparative evidence situation. Look, if you're a 20-year-old kid, so we're all in college, I don't know what your life experience was, but at 21 you only have so much life experience you can bring to the table. In a case that I would say she's equally similarly situated to each of them, though she's African-American seems to be the only difference, but more importantly, this is not a very complicated case because not only did two co-conspirators testify against Mr. Johnson, there was an eight hours' worth of statements that Mr. Johnson gave implicating himself in the crime that were coming out through the chief witnesses. So all it was was a matter of credibility to be determined, nothing that had legally complex issues with it that had been determined in terms of suppression and everything else. So I don't think that the justifications fly, and with that I see my time is up, but I thank you all for the opportunity to speak here today. Thank you, Mr. Holland. Ms. Wiseman. And Ms. Wiseman, before you begin, you agreed, do you not, that you have to prevail with respect to all four, that all four of these determinations have to have been at least reasonable by the doctor. First of all, just in response to Judge Kuntz's question, as my colleague said, at the time of regarding were there other African-Americans on the jury, we know of at least two who were actually on the jury at the time that this stats and colloquy began. We don't know, because there is no record of it, whether any of the subsequent jurors selected were African-American. Your Honor, obviously you're well aware of what the legal standard is here. The question is, was it unreasonable, beyond the point where reasonable minds might differ, for the trial judge, who was, again, I think we all know, was in the best position that anyone will be to make a determination about the credibility of the state prosecutor, whether his decision was unreasonable. It's clear the trial judge knew what he had to do and took that seriously. In the one case where the prosecutor was making a demeanor-based argument and the trial judge, as you pointed out, Judge Lynch, when the trial judge hadn't personally seen it, he actually called in the witness, questioned her, ascertained that there was something going on that could legitimately have been interpreted by the prosecutor as hissing. I also note that when the prosecutor was explaining his challenge, he said, you know, I wrote it down in my notes, hissing, and I think that's not something that you would do if you hadn't actually written it down because, you know, for all you know, this judge, who is an inquisitive type of judge, could ask to see your notes. So, you know, based on that, he's making the determination about the prosecutor's demeanor and credibility and about whether what he saw from his colleagues could be interpreted that way. And he obviously found, you know, his explanation, you know, maybe a little inartfully worded, but that is the nature of any extemporaneous speaking, including this speaking here. But it's very clear what he meant. He said to the defense the issue isn't whether she was actually hissing or talking to somebody. The issue is was there something here that the prosecutor perceived and correctly or incorrectly believed that was going on. And if the prosecutor believed that was going on, it doesn't matter if he was right or wrong because that's a race-neutral reason and he genuinely believed it. And that is always the issue. Was the prosecutor... Did the race-neutral reasons he gave, were they his real reasons or were they pretexts for racial discrimination? And I think in all of these, with respect to all four of these jurors, again, in selecting a jury, you know, if the prosecutor has to get all 12, he doesn't want a hung jury, so the defense sort of wins if they get one juror on their side. So the prosecutor always has to be careful and err on the side of caution. I think everybody does in jury selection because you can't sit down and, you know, examine everybody at great length. So you have to be careful. You see somebody who's making some noises, you don't know what they mean, well, let's not put that person on the jury because there are many bad things it could mean. You see somebody who, you know, works with people who are like your witnesses, who might be involved in that milieu, well, you don't know how she'll react, so let's not put her on the jury. May I just focus you on one thing and then we'll let you sit down? Back to Ms. Williams and sort of juxtaposing her with and her lack of life experience, which I think was the explanation given, with Mr. Wong and Mr. Berland, who were both relatively young and didn't seem to have much life experience. How do we assume where the trial, well, as your colleague has pointed out, we have the ability here to reassess the evidence in the same way. Tell me why we should determine that that was, whether we agree with it or not, that that was a reasonable view of the facts that the trial judge arrived at and then ultimately, I guess, not ultimately, yes, ultimately the appellate division. Well, you know, as I previously stated, I think this is, I think it is, to me at least, I think it is perfectly reasonable to have a jury selection rationale that says I don't want young people without life experience on the jury. Now, I should note that these two, there were two prospective jurors who the people did not challenge at the end, Mr. Wong and Mr. Berland. They were both, they did have some employment, which Ms. Williams did not have, and that's contrary to what the district court found, which I think was just based on a misreading of the record, as we explained in our brief. They also, those two jurors, were not satisfactory to the defense. The defense did strike them. So it's not, you know, these are not necessarily challenging jurors for this reason. You know, you can have priorities, let's say, in jury selection. You don't want a jury that has somebody who's too young and doesn't have life experience. Just in general, it's not a good idea, whether for the reasons Judge Lynch stated or for the, you know, having once been selected on a jury myself when I was just out of college, I've never allowed anyone of that age to be on a jury that I selected. Useful indiscretions. Yes, Your Honor. So that being the case, I think it's a rational concern. It's not the greatest concern. You might have a greater concern about people who are, you know, who are living with convicted murderers, you know, who killed drug dealers. You might have a greater concern about somebody who appears to you to have some mental issues. So when you're at a different stage in the jury selection, and when you are facing the prospect of a whole new unknown veneer showing up that might be very bad and you would have very few challenges, it makes sense to put your priorities differently. If there are no further questions, we ask you to reverse the decision block. Thank you. Thank you both. Helpful arguments. We'll reserve decision in this case. The next case on for argument is the last case on the docket, Association of Car Wash v. City of New York. Good morning, Your Honor. May it please the Court. My name is Ingrid Gustafson, appearing on behalf of the city. The district court erred in striking down any portion of this law on machinist preemption grounds. The district court misconstrued the plain language of the statute. It misconstrued the scope of machinist preemption, and it relied on improper materials in making a determination about legislative intent. But I'd like to start with the law's plain terms, because I think this is the crux of the issue. The surety bond provision here... That's where we start anyway, right? Absolutely. That is the focus of the preemption inquiry. The plain terms of the surety bond demonstrate that far from being a penalty on any employer, let alone a non-unionized employer, it is a protective measure for workers, the city, and the public. What this provision does as a whole, its focus, is to ensure that there are sufficient funds available to satisfy wage claims. It creates a baseline standard. In its specific operation, what it does is it creates a baseline that every car wash must obtain a $150,000 surety bond in large part to ensure that there are sufficient funds available to pay the substantial back pay obligations that members of this industry have repeatedly accrued. It then reduces it in two circumstances. Not just one, the presence of the union, in two circumstances, where there are alternate enforcement mechanisms in place that are targeted to meeting the goal of the $150,000 surety bond requirement. Those are where there is a collective bargaining agreement providing for the timely payment of wages and an expeditious process for resolving wage disputes and an independent monitoring agreement establishing similar terms. When we look at that statute as a whole, again, we see this provision as a whole, it is not a penalty, it is a protective provision, and it does not turn on the lack or presence of a union. And once we understand those terms, we see why machinist preemption does not apply to the one subdivision that is at issue here. This law, I think it's undisputed, does not regulate the mechanics of the collective bargaining process. It also doesn't regulate the mechanics of self-organization. Instead, what it does is like the minimum labor standards that have been repeatedly approved by the circuit courts and implicitly approved by the Supreme Court with opt-outs, it sets a baseline standard that it allows the parties to contract out of when there are targeted mechanisms in place to satisfy the legislature's initial concerns. The alternatives are the ones that you just recited at the beginning. That is correct. There are alternatives. One is CBA, so that means there's a union, right? Yes, but with the additional... Setting aside that one, then the second one, explain this independent monitoring. There is an independent monitoring agreement that has been entered into through a settlement with a state or federal regulatory agency, Department of Labor, Attorney General, both the state and federal level. They're the ones who have carried out enforcement actions in this area and who do... Yes, and who do enter into these types of independent monitoring agreements. Both of those provisions... I must caution that it is not merely the presence of a CBA. It is a CBA setting forth specific requirements, timely payment of wages, expeditious process for resolving wage disputes that are targeted to allaying the concerns of the underlying minimum labor standards. Do minimum labor standards with opt-outs affect the background employment law against which bargaining occurs? Yes, that is the argument that they've changed the incentives, that they could, in the application, impose additional costs. That has been the argument that has been made about every minimum labor standard with an opt-out, but has been almost universally rejected by the courts because it's too attenuated from the processes that the Act seeks to protect. So here, the claims of pressure, the claims of change in incentives, they fail as a matter of law because they don't matter to the machinist preemption, and they also fail as a matter of fact. They're unproven and implausible. They're unproven and implausible because this is... Well, they're unproven because this is happening at the pleading stage, right? So one question I had is, assume we largely wind up agreeing with you that this was a hasty judgment, what happens then? Do we reverse or do we remand and say, well, maybe there should be some discovery into just how coercive this bond is? They say it's a very large bond and a very large disparity between the opt-out, as you call it, I'm not sure that's exactly what it is, bond and the standard bond. But as is pointed out, they don't make any allegations. They don't have any evidence that talks about what the finances of people in this industry are, what the overall costs might be. I assume that most employers don't want a union for a whole host of reasons and they would expect that would increase their costs by a lot, and maybe this is only a little, well, we say all these things, but aren't they all speculative? Wouldn't it be useful to find out what the facts actually are against the possibility that the bond differential is in some way coercive? This Court does not need to remand. But Your Honor is correct. The district court here granted a summary judgment motion by the plaintiffs that was entirely unwarranted and premature. The alleged costs were speculative and unproven. They were rebutted by the results that plaintiffs claimed, that is that there is some pressure here for a union, or rebutted by the experience of California, which has a similar car wash worker law. That experience shows that provisions like these, $150,000 surety bond, do not, not only not inexorably lead to unionization, don't even commonly do so, 99% of registered car washes in California don't have this, are not members to a CBA. But this Court can grant judgment as a matter of law for two reasons. One, even if we assume, which is implausible and unproven, that the modest costs of this bond, and we at least agree, plaintiff's own expert testimony, was that the difference in cost, now the face value is yes, $120,000 is modest, is $1,200 to $3,600. That's their own expert. So even if we assume that that's more than the cost of unionization, which is implausible and highly unlikely, this Court can still grant judgment as a matter of law, because this claim that that would therefore change the incentives of the employer, is not one that warrants machinist preemption. Suppose the city said, we're going to impose an extra $3,600 tax on any car wash that doesn't unionize. Now that would be a very different statute than this, but it would be a similarly modest penalty, but that would clearly be preempted by the NLRA, wouldn't it? In this particular context, about background employment law, there is extensive precedent in this area, and what the Supreme Court has said is that federal labor law is interstitial to background state employment law. It only preempts state laws that frustrate the purposes of the National Labor Relations Act, which are to protect the processes of self-organization and collective bargaining. And when you have a law like this one, that sets a baseline substantive requirement, protective requirement for workers, courts have repeatedly said, yes, that has the potential to affect your incentives during collective bargaining. It shifts the background. If there is an opt-out, maybe it would change your incentives, but that is simply too attenuated from the collective bargaining process to warrant preemption. This court can decide this issue as a matter of law now, even accepting plaintiff's allegations about costs, which again are unproven and implausible, and at the very least, remand for further explanation would be warranted. Based on attenuation, we can enter judgment or we can affirm judgment as a matter of law based on your argument that you just gave us. The effect is too attenuated. That is what courts have repeatedly done in this area. In Fort Halifax, the Supreme Court case, the plaintiff's employer's argument was, well, you're hurting my competitiveness as a result of this minimum labor standard with an opt-out. The Supreme Court did not find the labor preempted. That was the argument in American Hotel in the Ninth Circuit that because you're allowing unions to contract out of its high minimum wage requirement, you're pressuring unionization. Ninth Circuit said too attenuated. Third Circuit in St. Thomas, St. John, addressed this very similar argument. There, there was a for-charge, that employees could only be dismissed for charge requirement that could be contracted out of, employers again said, but you're pressuring me to unionize. Third Circuit rejected that argument as well. As the Ninth Circuit said recently in American Hotel, state employment laws that set the stage for collective bargaining are not preempted. It's only if you're interfering in the mechanics of the processes that are protected by the National Labor Relations Act. Thank you, Ms. Gustafson. You've reserved three minutes for rebuttal. Thank you, Your Honor. We'll hear from Mr. Summers. Mr. Summers? May I please the Court, John Summers, for the Cross Appellant and Appellee Association of Car Wash Owners. Respectfully, as cross appellant, may I reserve two minutes for rebuttal? It's unusual, but yes, we'll let you do that. I'd like to cover two areas. First, the District Court correctly held that the machinist doctrine preempts the Car Wash Law's two-tier surety bond requirements. Second, the District Court erred in its severance remedy, crafting a single-tier $150,000 bond. There's no evidence from the legislative history supporting such a bond, and it's the largest licensing bond in New York City's history. Let me start with preemption. The U.S. Supreme Court's lead machinist preemption decisions compel the conclusion that a local government can't do what City Council did here. The Car Wash Law pressures employers to withhold their opposition to a union organizing campaign by requiring a non-union car wash to pay a $150,000 bond to the union car wash bond. Technically it doesn't, right? It's not non-union or union. It's got to do with whether there are these procedures in place in a collective bargaining agreement. Only a union, by definition, employer could qualify for that, but they'd have to have a particular set of remedies in place. The charge of this court is to, according to the Lovatis decision and the Brown decision, is to look at the actual content of the policy and its real effect on federal rights. That's the Brown decision, that's Lovatis. Here, the real effect and what this policy says is if there's a collective bargaining agreement that has certain characteristics, it's a $30,000 bond. If you don't, it's $150,000, and in the context of car wash industry, it's a union versus non-union distinction. Of course, that's exactly what the Ninth Circuit confronted in cases involving other sorts of opt-outs like maximum hours laws, where the employer had certain obligations under state law, but they were lifted if the parties collectively bargained to a different regime. And as the Supreme Court has held, those are entirely different kinds of cases. There's a lot of cases following metropolitan life. So just explain to me why it's different. Okay. It's different because those cases, first of all, involve minimum labor standards. This case doesn't. Facially, when you look at the statute, the ordinance covers if your honors are in a car accident in the car wash, then there's a fund of money for you to get. It covers environmental hazards. Suppose the city had two separate statutes. One of them says there's a $150,000 bond for covering wages, and a different one said there's a $30,000 bond to cover environmental and tort judgments. Let's just look at the $150,000 one, and that one is going to be not applicable under the circumstances that are the exceptions in this case. But the $30,000 is going to stay the same no matter what. Forget the $30,000 for a minute. Is the $150,000 with the, Gustafson calls it an opt-out. I'm not sure that's exactly the right term. Would that be constitutional? Would that be preempted? Yes. Even though that would clearly be. So the fact that there's another thing covered is really not your argument. It really is that this is not a minimum labor protection no matter what, even if there weren't tort and environmental issues factored in. Well, respectfully, it's both. So explain to me why it would be unconstitutional because preempted in the case where you didn't have the tort and environmental argument. It would be preempted because it interferes with the employer's decision under 8C of the NLRA to determine whether to impose a unionization movement. And that's under Brown what is the protected area. It intrudes in that area by penalizing. It's not like the other traditional labor standard cases. All those cases involve things like a setting of minimum hours, severance pay. They're terms. That isn't what this is. I'm sorry. I don't understand why the mechanism of the protection makes it not a labor protection. One kind of thing says you have to pay overtime if somebody works, for example, under a spread of hours kind of provision more than eight hours in a day. But if you have a union and you can get the union to approve of a plan where the workers work three 12-hour days rather than five 7-hour days or something like that, then you get out from under the labor standard. Why doesn't that create similarly an incentive to the employer to say, oh, I can get out of paying overtime if I have a union and I can get them to agree to something? The reason is because fundamentally in the opt-out cases, Fort Halifax kinds of cases, those are instances in which there is an alternative provision that's about a thing that is the subject of negotiation. And there can be a backdrop to those negotiations. And those cases say that there can't be an intrusion on the collective bargaining process. Here there's an intrusion on the collective bargaining process because it's all being done at the time of a unionization drive intended not to influence a term that is decided upon during a negotiation, but rather an intrusion on the collective bargaining process by an interference with whether there's unionization. Why doesn't the minimum wage one work the same way? Because if you've got a company that's not unionized and you're interested in reducing your labor costs in a certain way, and again, I don't know why in either of these cases this would all trump or coerce you when really what you're worried about is in the long run it's going to cost you more if you have a union. But put that aside. If we're hypothesizing that these different provisions can influence an employer not to oppose unionization, in each case the only way you get out from under the protective legislation is if you have a union. It's the same thing. I don't see why the minimum wage one, yes, it does directly affect the bargaining terms, which is actually what machinist preemption directly covers, but in the context of an employer who is not at that moment unionized, it creates an incentive to have a union in the same way that this does. Let me touch briefly on it, and then I want to turn to some of the other questions that were asked on the other side and then turn to severance. Fundamentally, the cases sharply distinguish between the opt-out and the other terms of a collective bargaining agreement, and there are cases that look like this, where there's an invasion of the collective bargaining process. There were some comments earlier about the level of attention. Right, because you were starting to say the cases sharply distinguish this from that. What are the cases that concern this as opposed to that? Brown, the district of Rhode Island decision that was close to Your Honor's hypothetical about the tax. There's nothing attenuated about the pressure. There's nothing premature or hasty about this decision. The undisputed record in front of the city council was, and I'll give one example, which was the surety bond company owner, Jeffrey Price. He testified that the higher the bond requirement, the more cash a company's got to have on hand at the end of the year. So it's not $30,000, it's $150,000. That's a lot. He said that there's an inevitable pressure because you pay greater taxes. You've got to have a certified financial associate with it. And again, in the context of Supreme Court decisions, there's no Supreme Court decision that says you need to do an econometric analysis or fancy study to look at pressure. In the Lovatos case, an employee lost three days' wages. And that was ample pressure, the imposition of a penalty on an employee. Here we have $120,000. In the Brown decision— Wait, wait, wait. Where is the evidence that there's a $120,000 penalty? The evidence is that in the testimony in front of city council, city council was told that a surety bond is unlike regular insurance. You need to have cash on hand, net worth. And you need to have greater net worth for the bond because you may end up having to pay. And that's where it comes from. And so there's nothing hypothetical or attenuated. It's on its face. In the Brown decision, they had the Supreme Court conclude that a statute that operated in the following way. A company like Verizon could have billions of dollars of money that it could spend to oppose a union. But California passed a law that said no money you get from us can be used to oppose a union. So if there's a billion—and that was sufficient intrusion. There is intake. A direct statement that you can't spend money opposing a union. Well, this is direct. You've got to pay effectively for a higher bond if you have a union. So there were billions of dollars. It was of no consequence to the companies. Because they could have ample—they had more than ample money to go ahead and do it. But the point is that facially, when you look at it, what is being told to the employer? Here, unequivocally, the real effect is that. May I turn briefly to severability? Very. Yeah, and you can start with the severability clause in the legislation. That's right. There's a severability clause in the legislation. There is—that is in the backdrop of the question that comes from a more-than-100-year-old case from Judge Cardozo as to what this court's charge is. And there's no disagreement between the city and we with respect to that. And that is the question is whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part extended or rejected altogether. And here, there were repeated occasions in which city council committee contemplated a single-tier bond and concluded—never got out of committee, didn't want to have one. There were repeated bills which contained a single tier and various other things, and there are various iterations, and then you get what you get, including a severability clause. What is better evidence of what the legislature would have wanted to do if one piece of this statute falls out than a severability clause that says if a court finds something unconstitutional in here, the rest will stand? We have—we—there are two alternative ways this could get handled. And we have—we urge the court to sever—recognize the severability clause and strike the bond provision. The bond provision in its entirety, and you can save the rest of the legislature. But what you're saying is preempted, is not a bond. There's nothing preempted about saying that a business, in order to be licensed, has to have a bond to cover possible claims against the business, including labor claims. What is preempted, you say, is that there is a differential which creates an incentive to unionize. Well, fair enough. Let's assume we agree with you on that. Why don't we strike the piece that creates that disincentive? That's what is preempted, not the existence of the bond. Fair inference in the legislative history, given what—given its—the multiple drafts, is that there is not a bond provision that's single-tier that would have been acceptable. I think Justice Scalia is looking down from heaven at this moment and wondering what is going to justify us in deciding what the legislature would have preferred based on statements in the legislative history, as opposed to a statement of what the legislature preferred that it put into the statute, voted on, and everybody agreed to. And atop one cloud is Justice Scalia, and atop another cloud is Judge Cardozo. Judge Cardozo actually wrote the opinion of the New York law that this court is charged to follow, not Justice Scalia. And Judge Cardozo says you look at what the—you do your best in looking at the legislative history to determine what— That they did not mean what they said when they wrote a severability clause into the statute. Respectfully, no, Your Honor. There was—our position is that respect the severability clause and strike the bond provision. The bond provision that made it out, the bond provision that was union-crafted, advocated during union drives, was two-tier. Now what we're looking at as legislative history is not just the random comments of city council members. Now we're looking at who liked the bill and who didn't like the bill, and we're going by the intent of the lobbyists who argued for the bill, not actually the legislative intent as expressed in the statute that they passed. Your Honor, you heard the city lawyer say they looked to California for the experience. The California experience was to get—was a two-tier bond, admittedly different, 150,000 and zero, to drive unions. And that's what this bond did. And that's what—and they looked to California for that experience. Your Honor, if you struck the bond provision— But we shouldn't look to the California experience that shows not really very much pressure on—towards unionization in terms of the outcome. To the contrary. The undisputed affidavit before the district court in front of Judge Hellerstein from the other Cardozo, Michael Cardozo, laid out the experience in California of—and its impact of the bond. And it was a significant experience. There was a decline in the number of licensed car washes after the enact of this bond. That shows it's a really bad law, and we should second-guess that. What does that show about unionization activity? Did car washes suddenly all turn to unionizing under the two-tier bond in California? Is there evidence of that? I believe there's evidence that there was an increase in unionization. And, in fact, the testimony before the city council, there was a committee report on an initial version of A275, a committee report on an enacted version, A817, that said and reported on the California experience highlighting the increased number of union members that are covered because of a law like this one. So, yeah, that was exactly what the California experience showed. And your primary position—you've been advocating here your fallback position— your primary position is the whole legislation should be stricken because of this, right? I respectfully disagree with prioritization. There was an initial— Are you asking us or are you not asking us, as relief, to strike down the entire rule? Are you withdrawing that request? I'm saying there are two alternatives that Your Honors could do. And one alternative is to strike the bond provision. Another alternative is to strike the bill. Judge Hellerstein— But there's no alternative to just strike the $30,000— No, that's not—that is so flatly inconsistent with the legislative history. I couldn't ask Your Honors to do that. That would be inconsistent with Judge Cardozo's direction. That's inconsistent with the legislative history. As Judge Hellerstein did, he initially struck the whole bill, and then he, on motions to reconsider, struck just that one portion of the bond provision, which we have a timely appeal from. Thank you. Thank you. Mr. Summers, and you've reserved some time for rebutting whatever Ms. Gustafson says in response to your appeal. And if she doesn't say anything in response to your appeal, you may remain seated. I do intend to. I am happy to address any questions from the Court on any of those issues, but I'd like to start with the costs, move through the California issue, talk about the three cases that plaintiffs were relying on in arguments around Lovatus and Rhode Island, and at the very end address severability. The cost issue, where the idea that there's substantial uncertainty about additional costs, like certified financial statements or what a bond would actually require, comes from plaintiffs' own affidavit at page 138 and 139 of the record, submitted in support of summary judgment. Plaintiffs are ignoring that affidavit in favor of the testimony that was given on the $300,000 bond, but as we have already addressed, even if we assume that with the original testimony on the $300,000 bond, which is not what was ultimately enacted, the costs that were given, again, were modest, and nonetheless it's implausible that this law would have the effect that plaintiffs claim, but in any event, those costs don't matter as a matter of law. Secondly, on California, every committee report addressing all the various versions of this law included some statement about unionization in California, including the versions of the law that didn't have any exceptions to the bond requirement. And there's no inference that can be drawn from the existence of a similar statement in every single committee report that the intent of this final law was slavery unionization. In any event, this court looks at the plain terms and effect of the law. And about California's experience, what the experience and the evidence in the record shows is that 99% of the registered car washes in California are not using a CBA to satisfy the bond requirement, which directly rebutts plaintiff's theory. It does not support it. On Brown, as Your Honor, Judge Leitch mentioned, that was a direct regulation of non-coercive employer speech. Brown itself was a unique case, as the Supreme Court said. Plaintiffs are over-reading Brown to a point where it would conflict with metropolitan life and with Fort Halifax. Plaintiffs read Brown to say any time you change the incentives of an employer to speak, you are preempted. But again, those were the arguments that were rejected in metropolitan life, Fort Halifax, and their progeny. Levatas is a fundamentally different type of case. It's not even clear that was decided on machinist grounds. Levatas instead looks at Nash, an earlier decision of the court, and focused on the issue of whether there was a penalty for the exercise of federal rights. And in that case, the court was concerned that merely by the act of signing a collective bargaining agreement containing an arbitration clause, the employee was losing the protection of the law, whether or not that arbitration clause covered the protection. That is entirely unlike this law. What I would term an opt-out is targeted to the same goals as the underlying provision. But even if plaintiffs could maintain that this case does not meet a narrow definition of minimum labor standard or opt-out, they've never explained why that is legally significant. The same reasoning that underlies all of those laws shows why this law is not preempted. Finally, on severability. So as to give your adversary at least two minutes to talk about that topic? Is that what you're going to do now? I'm sure she's not going to do that. I am so sure. There is no way that I am going to do that. I'm going to take the hint. I will therefore instead end on the only other case cited by plaintiffs, which was the case out of Rhode Island which involved a tax incentive, an entirely different set of circumstances. There's extensive case law in the area of background employment regulation by the states pursuant to their police powers. And those background laws have not been found preempted as having too attenuated an effect on the self-organization and collective bargaining process. This law was properly enacted by the city council pursuant to its police powers. It serves important interests. It protects vulnerable low-wage workers. It seeks to protect the environment in the city, and it seeks to protect consumers. It should be reinstated in its entirety. Thank you. Thank you both. Well-reserved decision, well-argued, and nice to see you, Mr. Cardozo. Did you hire her? Oh, all right. Okay. Anyway, everyone have a good day. I'll ask the clerk please to adjourn. It's good to know they're still doing a good hiring job. Thank you. Thank you. Thank you.